**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| JORDAN DIXON, individually and on behalf of all others similarly situated, | ) ) ) | Civil Action No.:  3:25-cv-9641-SAL |
| Plaintiff, | ) ) | |
| v. | ) ) | **CLASS ACTION** |
| SWEEPSTEAKES LIMITED, d/b/a Stake.us | ) ) ) | |
| Defendant. | ) ) ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Jordan Dixon ("Plaintiff" or "Dixon"), individually and on behalf of all others similarly situated, hereby alleges the following against Defendant Sweepsteakes Limited, d/b/a Stake.us ("Stake" or "Defendant"), based upon, *inter alia*, the investigation made by his counsel, and based upon information and belief, except as to those allegations and experiences specifically pertaining to Plaintiff which are based upon his personal knowledge.

## NATURE OF THE ACTION

1.     This case arises out of Defendant's operation of an illegal online casino in violation of South Carolina law.

2.     Defendant owns and operates one of the world's most popular and lucrative online casinos, known as Stake.com ("Stake.us"), available at https://stake.com.

3.     Although Stake.com has achieved global success, it is barred from operating in the United States due to stringent regulations on online gambling, which is entirely prohibited in several states, including South Carolina. In an apparent attempt to circumvent these legal restrictions, Defendant launched Stake.us—a platform advertised to U.S. consumers as a "social

casino" and sweepstakes gaming platform that allegedly does not involve real gambling. In truth, however, Stake.us is a virtual replica of Stake.com, merely rebranded to deceive both regulators and the public into believing it offers innocuous entertainment, when in fact it facilitates unlawful gambling activities.

4.    Through Stake.us, users have access to over approximately 1,200 industry games, including, *inter alia*, jackpots, slots, scratch cards, poker, baccarat, and roulette. Some of these games have the option to be played with a live dealer, further mimicking the experience of a physical casino.

5.    The casino games offered on Stake.us are entirely or primarily determined by chance. Therefore, the outcomes of these games are determined regardless of users' skills or history with the website. As such, the games of chance offered on the website are gambling, similar to the games played at traditional casinos.

6.    Defendant even admits to the existence of games of chance on their own website by advertising that players have "a chance to win big alongside Drake."[1] Moreover, Defendant admits to offering games such as Keno, "an ancient game of chance similar to lotto,"[2] and scratch cards, both of which are indisputably based entirely on random outcomes.

7.    On Stake.com, users purchase chips, place bets, and cash out their winnings— mirroring the experience of a traditional casino. Defendant was well aware that directly selling gambling chips to U.S. consumers would immediately expose Stake.us as an illegal online casino.

8.    To obscure the true nature of its operations, Defendant claims it only sells a virtual currency known as "Gold Coins," which it characterizes as nonredeemable tokens used solely for

---

[1] https://stake.us/drake (last accessed June 2, 2025).
[2] https://stake.us/blog/online-social-casino-guide (last accessed June 2, 2025).

casual gameplay. According to Defendant, these Gold Coins have no monetary value and cannot be exchanged for cash.

9.     However, every purchase of Gold Coins on Stake.us is bundled with a second token, called "Stake Cash," which is provided as a purportedly free bonus. Unlike Gold Coins, Stake Cash can be wagered on casino-style games and redeemed for real money at a fixed exchange rate of one U.S. Dollar per one Stake Cash—revealing its function as a vehicle for real-money gambling. The structure of these transactions makes clear that the true product being sold is Stake Cash, not Gold Coins. For example, a $20 purchase yields 20.1 Stake Cash and 200,000 Gold Coins; a $50 purchase yields 50.25 Stake Cash and 500,000 Gold Coins; and so on. This pricing structure, combined with the platform's gameplay, demonstrates that Defendant is selling access to real-money gambling while using Gold Coins as a facade to evade legal scrutiny and mislead consumers.

10.     By offering Stake Cash—which can be wagered on games of chance and redeemed for real money—Stake.us functions as an unlicensed and unlawful online casino. Operating without regulatory oversight, Defendant routinely violates South Carolina gambling laws.

11.     Virtual gambling is both highly addictive and tightly regulated under South Carolina law. The state's regulatory framework mandates that such games may only be offered by licensed operators at approved physical locations. Stake.us's operations evade these legal requirements by providing unlicensed gambling services to South Carolina residents via the internet which permits such games only through licensed operators at approved locations.

12.     Defendant's conduct disproportionately harms vulnerable populations, particularly those susceptible to gambling addiction and younger consumers lured by its "free play" marketing

strategy. Stake saturates social media with eye-catching advertisements, influencer endorsements, and promotional content designed to make its games appear fun, safe, and harmless.

13.    Plaintiff, individually and on behalf of all other similarly situated, seeks all available remedies at law and equity.

## PARTIES

14.    At all times material hereto, Plaintiff Jordan Dixon has been a resident of Kershaw County, South Carolina.

15.    Defendant Sweepsteakes Limited is a for-profit entity registered in Cyprus with its principal office at 28 Oktovriou, 313 Omrania BLD, Limassol, Cyprus, and a U.S. office at 13101 Preston Rd, Ste 110-5027, Dallas, TX 75240. Defendant owns and operates "Stake.us" and conducts business in South Carolina, including within this District, despite lacking formal registration to operate within the state.

## JURISDICTION AND VENUE

16.    This Court has jurisdiction over this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §1332(d), this Court has subject matter jurisdiction because (1) the amount in controversy, exclusive of costs and interest, exceeds the sum of $5,000,000.00, (2) the proposed Classes are comprised of at least 100 members, and (3) complete diversity exists between at least one plaintiff and one defendant.

17.    This Court has personal jurisdiction over Defendant because it conducts substantial business and directs its activities into this District, including activities that form the basis for the claims here, and a substantial part of the acts and omissions complained of occurred in this District.

18.    Defendant sells its products to consumers in South Carolina, including Plaintiff.

19.    Moreover, Defendant committed a tortious act within this state.

20.     Moreover, Defendant continuously and systematically conducts business in South Carolina and, upon information and belief, actively disseminates advertisements within the state with the intent of promoting and selling its products and services to consumers there. As such, Defendant does business with sufficient minimum contacts in South Carolina, and/or otherwise intentionally avails itself of the South Carolina market.

21.     Defendant has purposefully directed its activities toward the District.

22.     Defendant has purposefully availed itself of the privileges of conducting activities in this District.

23.     Plaintiff's claim arises out and relates to Defendant's forum-related activities.

24.     The exercise of jurisdiction over Defendant is reasonable.

25.     Upon information and belief, Defendant customizes its game for each market in which it is offered, including the United States. This customization includes modifying the language and currency used in Stake.us.

26.     Upon information and belief, Defendant has sold or illegally obtained a substantial amount of money worth of products to thousands of South Carolina residents, most of which are repeat purchases by the same customers, by contracting with the customers to sell virtual coins and other goods in exchange for legal tender.

27.     Stake.us targets and derives revenue from users in South Carolina, with South Carolina residents comprising a substantial portion of its customer base.

28.     Defendant deliberately chose not to use widely available geolocation technology—commonly employed by reputable gambling sites to block access from states where online gambling is illegal, like South Carolina—in order to allow South Carolina residents to access Stake.us and generate profits from their gambling activity.

29.    Defendant aggressively advertises Stake.us in the United States, including in this District. Those advertisements include linear media, social media advertisements and advertisements in other mobile applications.

30.    Upon information and belief, these advertisements for Stake.us were designed and directed to attract consumers in the United States, including this District, to play Stake.us.

31.    Upon information and belief, Defendant has the capability of targeting its Stake.us advertisements by geography and the capability of excluding residents of South Carolina from the reach of Defendant's advertisements for Stake.us.

32.    Upon information and belief, Stake ads are targeted at players that Defendant identifies as potentially interested in Stake.us, including residents of South Carolina. Upon information and belief, Defendant utilizes unique device identifiers and Google Advertising ID and IP addresses in connection with these targeted ads. This information allows Defendant to identify the geographic location of its ad targets, including whether they are in South Carolina.

33.    Upon information and belief, Defendant has taken no steps to restrict its advertisements for Stake.us from reaching residents of South Carolina.

34.    Upon information and belief, Plaintiff alleges that Defendant conducts professional and commercial activities in South Carolina on a substantial, continuous, and systematic basis. Thus, Defendant is subject to the general jurisdiction of the courts of this state.

35.    Moreover, the claims asserted in this complaint arise out of or are related to each of the Defendant's professional and commercial activities within South Carolina, and therefore the Defendant is subject to the specific jurisdiction of the courts of this state.

### **FACTUAL BACKGROUND AND COMMON ALLEGATIONS**

**I.    *The Problem of Online Gambling***

36.     Gambling addiction in the United States has escalated into a significant public health crisis, fueled by the rapid expansion of online casinos and sports betting platforms, including so called "social casinos."

37.     Since the Supreme Court's 2018 decision to legalize sports betting, the number of states with legal sportsbooks has surged from 1 to 38, with total sports wagers increasing from $4.9 billion in 2017 to $121.1 billion in 2023.[3] This proliferation has been accompanied by a dramatic rise in gambling addiction cases.[4]

38.     Approximately 2.5 million adults in the U.S. suffer from severe gambling problems, while an additional five to eight million experiencing significant issues.[5] Alarmingly, individuals with gambling disorders are 15 times more likely to commit suicide than the general population.[6]

39.     Between 2018 and 2021, the Nation Council on Problem Gambling (NCPG) estimated that the risk of gambling addiction grew by 30%. NCPG has also seen significant increases in calls, texts and chats to the National Problem Gambling Helpline—roughly a 45% increase in calls between 2021 and 2022.[7]

---

[3] https://today.ucsd.edu/story/study-reveals-surge-in-gambling-addiction-following-legalization-of-sports-betting? (last accessed May 27, 2025).
[4] *See id.*
[5] https://news.harvard.edu/gazette/story/2025/01/online-gambling-is-on-the-rise-panel-says-we-need-to-act-now/#:~:text=The%20National%20Council%20on%20Problem%20Gambling%20estimates%20that%20about%202.5,of%20callers%20is%20skewing%20younger. (last accessed May 28, 2025).
[6] https://www.who.int/news-room/fact-sheets/detail/gambling#:~:text=A%20Swedish%20study%20estimated%20that,the%20general%20population%20(4) (last accessed May 28, 2025).
[7] https://www.ncpgambling.org/news/ncpg-statement-on-the-betting-on-our-future-act/ (last accessed May 28, 2025).

40.     Further, internet searches for help with gambling addiction, such as "am I addicted to gambling," have cumulatively increased 23% nationally since *Murphy v. NCAA* through June 2024. This corresponds with approximately 6.5 to 7.3 million searches for gambling addiction help-seeking nationally, with 180,000 monthly searches at its peak.[8]

41.     The surge in gambling addiction is particularly pronounced among young men, with 10% exhibiting behaviors indicative of gambling addiction, compared to 3% of the general population.[9] Online platforms, including social casinos, have been identified as significant contributors to this trend. These platforms often employ addictive design features, such as near-miss outcomes, fake limited-time sales, and variable reinforcement, to keep users engaged.

42.     The addiction and fallout related thereto is not limited to gamblers. It has a ripple effect that negatively impacts spouses, partners, children, and employers. Moreover, despite the growing prevalence of gambling addiction, funding for treatment remains insufficient.

43.     In South Carolina, it is illegal to gamble in unlicensed venues, including online sources. In this regard, South Carolina has a fundamental and deep-rooted public policy against gambling.

**II.     *Defendant Uses Free "Social Gaming" as a Pretext for Real, Online Gambling.***

44.     Stake.us advertises itself as a "social casino" website to avoid gambling regulations and reassure potential players that it offers casino-style games purely for entertainment, without real-money stakes.

45.     Stake.us offers a multitude of casino-style games such as slot games, scratch cards, poker, and other table games such as blackjack and roulette.

---

[8] *See* FN 2.
[9] https://apnews.com/article/sports-betting-compulsive-gambling-addiction-d4d0b7a8465e5be0b451b115cab0fb15 (last accessed May 28, 2025).

46.     Stake.us is a thinly veiled replica of Stake.com—an internationally recognized online gambling site. A side-by-side comparison of the two platforms reveals that Stake.us mirrors Stake.com in nearly every respect, including its overall appearance, layout, and user experience, as illustrated by the images below:

Stake.us


Stake.com


47.     Both websites prominently display the same suite of casino-style games and utilize identical color schemes, branding, logos, graphic elements, and visual design. Their user interfaces are virtually indistinguishable. These similarities are not coincidental. Defendant intentionally designed Stake.us as a copy of the highly successful Stake.com platform, rebranded solely to circumvent U.S. gambling laws and mislead regulators and consumers.

48.     As detailed further below, Stake.us enables players to purchase and wager a digital token known as "Stake Cash" on games of chance, including slot machines, bingo, blackjack, roulette, and other casino-style offerings. Indeed, the interface in the game itself is carefully designed to transition layers from gameplay using Gold Coins to gambling with real money with Stake Cash.



49.     At the top of every game on Stake's platform are toggles that enable players, with just a single click or tap, to switch between wagering non-monetary Gold Coins and Stake Cash. This simple toggle mechanism is designed to make it as easy as possible for players to transition from casual, risk-free play to gambling with real-world stakes. Players who start out playing for fun—believing they are enjoying a harmless, "social" casino experience—can quickly and effortlessly shift to risking actual money without fully appreciating the financial consequences.

50.     For these reasons, many players are misled into believing they are engaging in harmless gaming, only to find themselves spending significant sums of money chasing Stake Cash winnings. Stake's platform uses celebratory animations, sound effects, and other psychological triggers—hallmarks of traditional slot machines—to keep players engaged and spending.

51.     To make matters worse, Stake imposes confusing "playthrough" requirements that make it more difficult for players seeking to redeem their winnings: For every amount of Stake Cash that you receive as a bonus alongside your purchase of Gold Coins, you would need to play it through at least 3x over before redemption is available. So only Stake cash received alongside your purchase would have a rollover. Here is an appropriate example: If you purchase Gold Coins and receive 10 Stake Cash as a bonus, you are required to play through with at least 30 Stake Cash before redemptions are available. After you complete the rollover you are free to redeem prizes with those funds, however if you, in the meantime, receive more Stake Cash alongside a new purchase Redemption section will still be locked until that amount of Stake Cash is played through 3X.

52.     This restrictive condition significantly impairs users' ability to redeem winnings and effectively forces continued gambling activity. The playthrough requirement operates as a coercive mechanism, compelling users to risk further losses under the guise of accessing previously earned rewards. This practice is misleading, particularly when users are initially lured to the platform by representations that it is merely a "social casino" offering free-to-play entertainment. In reality, the platform's design systematically incentivizes and prolongs gambling behavior while obscuring the difficulty of actually obtaining monetary rewards—underscoring the predatory nature of Defendant's operations.

53.     Like physical chips in a traditional casino, Stake Cash can be redeemed for real money at a fixed rate of one U.S. Dollar per one Stake Cash. In substance and effect, Defendant is operating an unlicensed and illegal online casino within the State of South Carolina.

54.     Stake's games are designed to be purely games of chance, with outcomes determined entirely by algorithms simulating random number generation. Players have no meaningful ability to influence results through skill, strategy, or decision-making.

55.     Defendant actively promotes the chance-based nature of its games to entice players with the allure of significant potential winnings. Through branded social media channels and marketing materials, Stake repeatedly emphasizes the possibility of large payouts.

56.     The absence of any skill component highlights the games' exclusive reliance on chance. For example, virtual slot machines require only a single action—a button press—to spin digital reels governed by random number generators (RNGs). Similarly, games like bingo and scratch cards offer no opportunity for players to affect outcomes, which are entirely determined by random algorithms.

57.     Defendant has deliberately replicated key elements of licensed casino games to create an authentic gambling environment. The platform's visual and auditory design—including spinning reels, jackpot animations, celebratory sound effects, and real-time win notifications—is intentionally engineered to evoke the same psychological stimuli and excitement found in traditional casino settings.

58.     By offering these games of chance for real-money wagers through Stake Cash, Defendant operates an unlicensed and unregulated online casino in violation of South Carolina gambling laws.

59.     In addition to its catalog of virtual games, Defendant further enhances the realism of its platform by offering "Live Dealer Games." These games are advertised as allowing players to "interact with human dealers" and to "experience what it would be like to be at a land-based casino while you're sitting comfortably at home behind your computer screen or on your mobile device."



60.     In these Live Dealer Games, players wager Stake Cash, interact with dealers and other participants via live chat, and observe real-time video streams of human dealers managing casino activities such as card dealing and roulette spins. The immersive and lifelike nature of these features intensifies the gambling experience, making it virtually indistinguishable from participating in a traditional, brick-and-mortar casino.

### III.     *How the System Works.*

61.     Stake.us introduces players to two forms of virtual currency: "Gold Coins," which are purportedly for entertainment only and carry no real-world value, and "Stake Cash," a currency that can be redeemed at a fixed 1:1 exchange rate with the U.S. dollar. In reality, Stake Cash serves as the operative currency behind Defendant's illegal online gambling enterprise.

62. Upon first accessing the Stake.us platform, users receive a complimentary amount of Gold Coins. Additional Gold Coins can be obtained through various promotional offers and marketing initiatives.

63. Despite being promoted as a mere bonus included with Gold Coin purchases, Stake Cash is the true driver of Defendant's gambling operations. It holds intrinsic monetary value and is redeemable for actual U.S. dollars at a fixed one-to-one rate.

64. Until recently, users could purchase and redeem Stake Cash using both traditional fiat currency and cryptocurrency. However, as of the date of this filing, Stake.us only permits transactions involving cryptocurrency, including Bitcoin and Ethereum.

65. Regardless of how Defendant markets it, Stake Cash functions as real money. It allows users to place wagers with tangible value and convert their virtual winnings into actual currency, directly linking online gameplay to real-world financial stakes.

66. Although Defendant claims that Stake Cash is obtainable without purchase, this representation is misleading. While limited amounts of Stake Cash are available through infrequent and impractical promotions—such as a nominal daily login bonus or a cumbersome mail-in request—these methods are insufficient for sustained gameplay. Once the initial promotional allotment is exhausted, users are effectively required to purchase more Stake Cash to continue gambling.

67. Plaintiff, and on information and belief, and the majority of Stake.us players, routinely buy additional coin bundles after depleting their Stake Cash, even when they retain a surplus of Gold Coins. This pattern reflects that users are primarily incentivized by the opportunity to gamble with Stake Cash, rather than any actual interest in using Gold Coins for entertainment.

68.    The pricing structure for coin bundles further illustrates that Gold Coins serve merely as a facade. For instance, a $20 purchase provides 200,000 Gold Coins and 20.1 Stake Cash; $50 yields 500,000 Gold Coins and 50.25 Stake Cash; and $300 provides 3,000,000 Gold Coins and 300.5 Stake Cash. These nearly dollar-for-dollar exchanges expose the true transactional nature of Stake Cash.

69.    Users wager Stake Cash in the same manner as Gold Coins. However, unlike Gold Coins, Stake Cash can be redeemed for real money or prizes. Until recently, players could purchase and redeem Stake Cash using either fiat- or crypto-currency. However, as of the date of this filing, Stake requires players to purchase and redeem Stake Cash using cryptocurrency, including Bitcoin and Ethereum. To that end, Stake explicitly informs players that: Stake Cash will be redeemable at an implied rate of 1 Stake Cash per 1 USD. As such, the amount of cryptocurrency that can be redeemed per 1 Stake Cash will be determined by the market price of that cryptocurrency in USD at the time of such redemption.

70.    As such, users are engaging in real gambling—risking money on games of chance with the hope of financial return. The Stake Cash qualifies as a thing of value.

71.    The gambling model has proven extremely profitable for Defendant. In 2024 alone, Stake.com reported revenues of $4.7 billion.

72.    Platforms like Stake.us are fueling a surge in gambling addiction due to their widespread accessibility and ease of use. Numerous online forums include personal accounts from individuals suffering gambling-related harm, many of whom specifically identify Stake.us as a contributing factor.

73.     Regardless of a user's skill level or experience, outcomes on Stake.us games are largely dictated by chance. While some players may win based on random luck, others will lose just as easily, underscoring that these games rely on randomness, not skill, to determine results

### IV.     *Defendant Resurrects Internet Sweepstakes Café Model from Early 2000s*

74.     In the early 2000s, many operators sought to evade state gambling laws by launching so-called "Internet cafés," which claimed to sell products like internet access or long-distance phone minutes but were actually thinly veiled fronts for casino-style gambling. These businesses offered customers "free" sweepstakes entries with each purchase, allowing them to play slot-style games on computer terminals for the chance to win real cash. Similarly, Stake employs a modern version of this scheme by using a two-tiered virtual coin system that mimics casino chips.

75.     Most state gambling laws define gambling as requiring three essential components: (1) payment or consideration, (2) an element of chance, and (3) the opportunity to win a prize. Internet café operators sought to evade regulation by asserting that their sweepstakes entries were merely complimentary bonuses tied to legitimate purchases—comparable to promotional giveaways by major brands. However, this supposed distinction was a façade; in truth, the transactions were structured primarily and deliberately to facilitate gambling activity.

76.     Courts and law enforcement agencies across the United States uniformly concluded that these so-called sweepstakes promotions were thinly veiled gambling operations, and moved to shut them down under applicable state gambling laws.

77.     Stake.us now attempts to revive this discredited business model. While branding the operation as a "sweepstakes," Stake.us—like the Internet cafés before it—attempts to obscure the gambling element by artificially separating consideration from chance.

78.    Defendant will urge the Court to accept the fiction that its operations are not gambling, but rather legal "sweepstakes" entertainment. That argument is not new—it is the same tactic employed by illegal gambling outfits in the early 2000s, which courts and regulators uniformly rejected.

79.    As outlined below, Stake.us operates under a fundamentally identical scheme: users appear to buy "Gold Coins," yet they are also given "Stake Cash," which hold real-world monetary value and are used to play games of chance that mimic traditional casino gambling. The superficial inclusion of so-called "free" entry methods and the branding of the platform as a "sweepstakes" do not alter the legal substance of the operation. Courts have repeatedly ruled that such business models violate gambling laws.

80.    Defendant's attempt to rebrand illegal online gambling as a sweepstakes promotion is part of a familiar pattern already discredited by courts, regulators, and the public. Stake.us's operations are not novel—they are a modern replica of a failed and unlawful model.

## V.    *All Purported Contracts With Defendant Are Void*

81.    Any purported contract with Defendant is void pursuant to South Carolina public policy and S.C. Code Ann. § 32-1-40, which states: "[a]ll notes, bills, bonds, judgments, mortgages or other securities or conveyances whatsoever given, granted, entered into or executed by any person whatsoever when the whole or any part of the consideration of such conveyances or securities shall be (a) for any money or valuable thing whatsoever won by . . . gaming or playing at cards, dice tables . . . or other game whatsoever or by betting on the sides or hands of such as do game at any of the games aforesaid or any other game or games or (b) for the reimbursing or repaying any money knowingly lent or advanced at the time and place of such cockfighting, horse

racing or play to any person (i) so gaming or betting as aforesaid . . . so bet shall be utterly void, frustrate and of none effect to all intents and purposes whatsoever."

82.     Parties cannot lawfully contract to engage in gambling any more than they can lawfully agree by contract to engage in forced labor, sex trafficking, illicit drug sales, or other crimes. Any purported contractual relationship between Plaintiff and Defendant—premised on participation in illegal gambling activity—is therefore void ab initio. *See White v. J.M. Brown Amusement Co.,* 360 S.C. 366, 371, 601 S.E.2d 342, 345 (2004) ("The general rule, well established in South Carolina, is that courts will not enforce a contract when the subject matter of the contractor an act required for performance violates public policy as expressed in constitutional provisions, statutory law, or judicial decisions.").

83.     Thus, by this Complaint, Plaintiff voids any purported contract between himself and Defendant. As a result, Defendant may not invoke any contractual defenses—including arbitration clauses, choice-of-law provisions, or class action waivers—because no valid or enforceable agreement exists.

## FACTS SPECIFIC TO PLAINTIFF

### *Plaintiff Jordan Dixon Experience*

84.     Plaintiff Dixon began playing on Stake.us in or around November 2024.

85.     Plaintiff Dixon has played several chance-based games on Stake.us, including poker, slots, and roulette.

86.     Plaintiff Dixon accessed Stake.us from his residence in South Carolina. Cardoso received an initial allotment of Gold Coins and Stake Cash. After losing his initial allocation of free Gold Coins and Stake Cash, he began purchasing Stake Cash from Defendant to continue playing using real currency deposits and did so from South Carolina, which Defendant accepted.

87.     Plaintiff Dixon placed all of his wagers (including his Stake Cash) in or from this District.

88.     Overall, Plaintiff Dixon wagered and lost approximately $2,000.00 in real-world currency while using Stake.us and its casino-style games of chance to win real cash prizes. He lost the cash he purchased by wagering it in Defendant's games of chance.

89.     By and through Stake.us's gambling features described above beginning approximately in November 2024, Dixon was induced into making certain in-game purchases that he otherwise would not have made. Plaintiff was unaware that Stake was an illegal gambling game.

90.     Plaintiff wagered and lost more than $50.00 within the past three (3) months.

91.     As a result of Defendant's unfair, unlawful, and deceptive acts, Defendant was unjustly enriched.

## CLASS ALLEGATIONS

92.     Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b) on behalf of themselves and all others similarly situated defined as follows:

93.     The Class is defined as follows:

> All South Carolina residents who, during the applicable limitations period, played and lost at least $50.00 wagering on Defendant's online casino games.

94.     **Numerosity.** Upon information and belief, there are hundreds, if not thousands, of Class members, so joinder of all members is impracticable. The precise number of class members and their identifies are unknown to Plaintiff currently but may be ascertained from Defendant's books and records and other third-party sources.

95.     **Commonality.** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions

that may affect individual members of the Class. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

(a) Whether the games in Stake.us are gambling as defined under South Carolina law;

(b) Whether Defendant engaged in the conduct alleged in the Complaint;

(c) Whether Defendant violates the statutes listed below in Count I;

(d) Whether Defendant violated statutes analogous to those alleged herein applicable;

(e) Whether and how Defendant manipulates the odds in games offered in Stake.us;

(f) Whether Plaintiff and the other Class members were damaged by Defendant's conduct; and

(g) Whether Plaintiff and the other Class members are entitled to restitution or other relief.

96. **Typicality**. Plaintiff's claims are typical of the claims of the Class because they were players of Stake.us who made in-game purchases of coins and wagered such coins as a result of Defendant's unlawful and wrongful conduct. The factual and legal basis of Defendant's liability to Plaintiff and to the other Class members are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the other members of the Class have suffered harm and damages due to Defendant's unlawful and wrongful conduct.

97. **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other members of the Class.

98.     **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiff and putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the proposed Class to individually seek redress for Defendant's wrongful conduct.

99.     **Final Declaratory or Injunctive Relief.** Defendant has acted and failed to act on grounds generally applicable to the Plaintiff and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

## <u>FIRST CAUSE OF ACTION</u>
### VIOLATION OF S.C. Code Ann. § 12-21-2710

100.     Plaintiff incorporates by reference the allegations contained in paragraphs 1-99 of this Complaint.

101.     Plaintiff brings this count individually and on behalf of all other Class members.

102.     Plaintiff has standing under this statute because he suffered an injury in fact and lost and/or paid money as a result of Defendant's unlawful and unfair conduct.

103.     Plaintiff wagered and lost money gambling on Defendant's casino-style games within the last three (3) months.

104.     South Carolina law strictly prohibits unauthorized gambling operations under S.C. Code Ann. § 12-21-2710, which states:

It is unlawful for any person to . . . operate . . . within this State any . . . slot machine, or any video game machine with a free play feature operated by a slot in which is deposited a coin or thing of value, or other device operated by a slot in which is deposited a coin or thing of value for the play of poker, blackjack, keno, lotto, bingo, or craps, or any machine or device licensed pursuant to Section 12-21-2720 and used for gambling or any punch board, pull board, or other device pertaining to games of chance of whatever name or kind, including those machines, boards, or other devices that display different pictures, words, or symbols, at different plays or different numbers, whether in words or figures or, which deposit tokens or coins at regular intervals or in varying numbers to the player or in the machine[.]

105.    As described above, Defendant has violated S.C. Code Ann. § 12-21-2710.

106.    Plaintiff is seeking recovery of the money lost or delivered from Defendant pursuant to S.C. Code Ann. § 32-1-10, which states:

Any person who shall at any time or sitting, by playing at cards, dice table or any other game whatsoever or by betting on the sides or hands of such as do play at any of the games aforesaid, lose to any person or persons so playing or betting, in the whole, the sum or value of fifty dollars and shall pay or deliver such sum or value or any part thereof shall be at liberty, within three months then next ensuing, to sue for and recover the money or goods so lost and paid or delivered or any part thereof from the respective winner or winners thereof, with costs of suit, by action to be prosecuted in any court of competent jurisdiction.

107.    Plaintiff and the Class seek—and are entitled to—full recovery of the money lost and paid or delivered from Defendant.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of all others similarly situated, the following relief:

1. For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, defining the Class as requested herein, appointing Plaintiff as class representative and his counsel as class counsel;

2. Awarding Plaintiff all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and to be determined by proof;

3. Awarding Plaintiff and the class members appropriate relief, including actual and statutory damages;

4. Awarding Plaintiff's reasonable attorneys' fees, costs, and other litigation expenses;

5. Awarding pre- and post-judgment interest, as allowable by law;

6. For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

7. For public injunctive relief as the Court may deem proper; and

8. Awarding such further and other relief as the Court deems just, proper and equitable.

## **JURY DEMAND**

Plaintiff requests trial by jury of all claims that can be so tried.

Dated: August 4, 2025

Respectfully Submitted,

By:     PARKER LAW GROUP, LLP

s/Ashley B. Nance
Ashley B. Nance
Fed Id. No.:  11093
anance@parkerlawgroupsc.com
(Florence Office)
601 W. Evans St.
Florence, South Carolina 29501

(Main Office)
101 Mulberry Street East
Post Office Box 457
Hampton, South Carolina 29924
(803) 903-1874

**(Local Counsel)**

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis, Esq.
Florida Bar No. 101754
ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
(t) (305) 479-2299
(f) (786) 623-0915

(***Pro Hac Vice*** **Forthcoming**)

**EDELSBERG LAW, PA**
Scott Edelsberg, Esq.
Florida Bar No. 100537
scott@edelsberglaw.com
20900 NE 30th Ave., Suite 417
Aventura, FL 33180
Telephone: 305-975-3320

(***Pro Hac Vice*** **Forthcoming**)

*Counsel for Plaintiff and Proposed Class*